

# NUMBER 13-23-00505-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**ESTEN CHAVEZ,**                                                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                            **Appellee.**

## ON APPEAL FROM THE 347TH DISTRICT COURT
## OF NUECES COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca**
**Memorandum Opinion by Justice West**

Appellant Esten Chavez was convicted of murder, a first-degree felony (Count I); aggravated assault, a second-degree felony (Count II); and three counts of deadly conduct, a third-degree felony (Counts III–V). See TEX. PENAL CODE ANN. §§ 19.02, 22.02, 22.05. He was sentenced to prison terms of forty years on Count I, twenty years on Count II, and a total of ten years on Counts III–V. On appeal, Chavez argues that the evidence

was insufficient to support his convictions because "there was ample evidence of self-defense and defense of a third party." We affirm.

## I. BACKGROUND

In the early hours of November 13, 2021, Chavez and his wife, Christina Garcia, left a Corpus Christi club headed for another club. Chavez's car is recorded on dash-cam footage facing southbound on Staples Street at the intersection with Holly Road. Garcia exited the car and engaged in an altercation with occupants of an adjacent dark colored car, also in the southbound lanes. At trial, Garcia and Chavez testified that the dark car was driven recklessly and nearly hit them. The dark car turned left onto eastbound Holly Road. Garcia returned to Chavez's car, and they commenced straight on southbound Staples Street through a red light.

The video shows that, within sixty-five seconds, Chavez returned to the intersection, turned onto Holly Road in the direction of the aforementioned car, and began tailgating a different dark colored car driven by Roslyn Ramon and occupied by four others. At trial, Kenndara Grant, the occupant in the front passenger seat of Ramon's car, described Ramon's and Garcia's cars as "bumper to bumper" and stated the "lights got bright." Patience Best, an occupant in the back seat of Ramon's car, testified Chavez was so close that Best initially thought a police car was behind them shining a bright light. Grant testified that Chavez switched lanes and positioned his car parallel with Ramon's. She then noticed Garcia "talking mess," "mouthing off," and "getting rowdy or aggravated." Grant described Chavez's appearance as "mad," "frustrated," or "angry." Grant testified that she rolled down her window, gestured with her hands in the air, and said "What's

2

up?" or "What's going on?" because she assumed something was wrong. Grant then stated she saw Chavez bearing a gun, and she ducked. Thereafter, Chavez fired eleven shots at both the back and front of the passenger side of Ramon's car. Ramon was fatally hit, and Grant was wounded in the leg.

Dash-cam footage from Ramon's car reveals the rapid timeline of the foregoing events. Ramon noticed Chavez tailing them at time stamp 3:27, another occupant noticed Chavez appeared to be passing them at time stamp 3:32, the front of Chavez's car entered the camera footage and maintained a parallel position with Ramon's car at time stamp 3:37, one of the occupants stated "why the [expletive] they going like that?" at time stamp 3:39, three shots were fired successively at time stamp 3:42, five shots were fired successively at time stamp 3:44, and three more shots were fired successively at time stamp 3:47.

Bystander witnesses heard the shots and observed Chavez accelerate and run a red light in flight from the scene. Later in the morning, Garcia sent Chavez a Facebook article about Ramon's death and law enforcement's search for the shooter. Within twenty-two hours of the shooting, police identified, interviewed, and arrested Chavez.

In his police interview, Chavez admitted to shooting at Ramon's car, claiming self-defense. However, he initially denied there was a previous altercation between Garcia and occupants of a different dark-colored car until law enforcement informed him that they had tracked his route on city cameras and discovered the prior altercation that took place at the intersection of Staples Street and Holly Road. Eventually, Chavez told police the people he shot at were "more than likely" the same people that Garcia fought with at the

3

intersection. Similarly, Garcia testified at trial that when Chavez shot at Ramon's car, "we thought it was the same people."

Additionally, Chavez stated to police that he knew when he read the article sent by Garcia that it involved his shooting of Ramon's car but that he did not contact police at the time because he was scared, nervous, and did not know what to do. However, at trial, he stated that he did not know whether the article was about his shooting or not. He further testified that when police contacted him for an interview about a murder, he did not know what they were talking about. During his police interview, Chavez stated that he cleaned his car after the shooting and then later said he did not clean his car. At trial, he testified he cleaned his car after the shooting because he likes to keep it clean. Chavez testified that he did not recall driving behind Ramon's car or slowing down to match her speed when maneuvering in the lane next to her car. He testified that he could not think of any reason why he ran a red light after shooting at Ramon's car.

Chavez asserted that he shot at Ramon's car in self-defense and in defense of Garcia, and the jury was instructed as to such justifications. The jury rejected Chavez's defenses and convicted him as set forth above. The trial court sentenced Chavez in accordance with the jury's punishment. This appeal followed.

## II.  DISCUSSION

### A.  Standard of Review & Applicable Law

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979)).

4

"In assessing the sufficiency of the evidence to support a criminal conviction, 'we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. at 607–08. This familiar standard recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence. *Id.* at 608*.* On review, we determine whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence. *Id*. We presume the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *Id*.

We measure the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Id*. A hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Here, a hypothetically correct jury charge would instruct the jury that Chavez was justified in using deadly force against Ramon "when and to the degree [he] reasonably believes the force is immediately necessary to protect himself" against Ramon's use or attempted use of unlawful deadly force. *See* TEX. PENAL CODE ANN. §§ 9.31(a), 9.32(a). With respect to defense of a third person, the Texas Penal Code provides as follows:

> A person is justified in using force or deadly force against another to protect a third person if: (1) under the circumstances as the actor reasonably

believes them to be, the actor would be justified under [§] 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

*Id.* § 9.33(1)–(2). A defendant's "belief" related to using force is presumed reasonable if he (1) "knew or had reason to believe that the person against whom the force was used . . . was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery"; (2) "did not provoke the person against whom the force was used"; and (3) "was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used." *Id*. § 9.31(a). If the presumption does not apply, however, then we must analyze whether the defendant's belief was reasonable. A "reasonable belief" under the foregoing provisions entails both an objective and subjective inquiry. *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). First, the defendant's "belief" must be one "held by an ordinary and prudent man in the same circumstances as the [defendant]." *Id.*; *see* TEX. PENAL CODE ANN. § 1.07(a)(42). Second, the defendant must subjectively believe that another person is using or attempting to use unlawful force (§ 9.31) or deadly force (§ 9.32) against the defendant and that the defendant's use of unlawful or deadly force in response was immediately necessary. *Lozano*, 636 S.W.3d at 32.

In a claim of self-defense or defense of third persons, the defendant bears the burden to produce evidence supporting the defense while the State bears the burden of persuasion to disprove the raised issues. *Braughton*, 569 S.W.3d at 608. The defendant's

6

burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Id*. "By contrast, the State's burden of persuasion 'is not one that requires the production of evidence; rather, it requires only that the State prove its case beyond a reasonable doubt.'" *Id*. (quoting *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)). Thus, in resolving the sufficiency of the evidence issue, we do not look to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine, after viewing all the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt and also could have found against appellant on the self-defense issue beyond a reasonable doubt. *Id*. at 609.

**B.    Analysis**

Chavez argues he is entitled to the reasonable belief presumption because, while he was driving next to Ramon's car, he believed he saw Grant raise an object that looked like a gun. He testified that it was a tan, shiny object. In his police interview, he stated he was seventy-five percent sure he saw a gun. At trial, he testified that he thought he saw a gun. But he also testified that it could have merely been a Hennessy bottle that he mistakenly believed was a gun. He testified he did not know if an occupant of Ramon's car fired a gun. Nevertheless, Chavez testified that upon seeing what he thought was a firearm, he grabbed his nine-millimeter and started shooting at Ramon's car with no particular aim because he saw it as "shoot or be shot."[1] However, Grant testified no

---

[1] Chavez also complains that police did not conduct gunshot residue testing on the occupants of Ramon's car or search for a firearm at the crime scene. Such argument holds no merit given that police

7

occupant had firearms. Best testified that, at one point while they were driving, Grant had a Hennessy bottle in her hand but no firearm. There is no indication from the dash-cam audio that Grant or any other occupant in the car grabbed or fired a gun.

We presume the jury resolved evidentiary conflicts consistent with the verdict. *See id.* at 608–09. Thus, the jury's verdict necessarily signals its belief that Chavez and Garcia's testimony was untruthful. *See id.* at 609. It was within the sole province of the jury to weigh credibility and accept or reject defensive evidence. *See id*. at 608; *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). The jury is even permitted to reject uncontradicted defensive testimony, so long as its rejection of such was rational in light of the remaining evidence in the record and is not contradicted by indisputable objective facts. *See Braughton*, 569 S.W.3d at 612.

Viewing the evidence in the light most favorable to the verdict, we find a rational trier of fact could have found against Chavez on his defenses beyond a reasonable doubt. *See id.* at 607–08. The jury heard evidence of Chavez's immediate return to the location of the initial confrontation, his close tailgating of a similar car (Ramon's), his maneuvering parallel to Ramon's car in an adjacent lane, his firing of the first shot just five seconds after leveling with Ramon's car, and his firing of ten more bullets throughout the entire side of the car. The dash-cam footage revealed occupants in Ramon's car initially engaging in miscellaneous conversation before becoming startled and confused as to why Chavez was tailgating so closely with lights beaming and levelling with them in a side lane. The entire event—from the time Garcia engaged the initial car at the intersection to

had no knowledge or reason to anticipate Chavez's self-defense claim until he first asserted it in his police interview twenty-two hours after the shooting.

8

Chavez's shooting of Ramon's car—occurred in less than two minutes. The foregoing, coupled with Chavez's flight from the scene, his failure to contact law enforcement, his cleaning of the car involved in the altercation, his conflicting testimony, his inability to recall major events he undertook on the night in question, and Grant's and Best's testimony that they did not have a firearm is more than enough for a rational juror to reject Chavez's defensive theories. *Id*. at 612 (citing *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony.")).

Thus, the jury was well within its authority to find Chavez was not justified in using force nor entitled to a presumption of reasonable use of force. *See id.* at 617. And we will not substitute our judgment for that of the jury's. *See id.* at 608; *Isassi*, 330 S.W.3d at 638. The evidence was sufficient to support the convictions. Thus, we overrule Chavez's sole issue.

## III.    CONCLUSION

We affirm the judgment of the trial court.

JON WEST
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
24th day of July, 2025.

9